# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8945 | **DATE** | September 19, 2003 |
| **CASE TITLE** | GARCIA vs. CITY OF CHICAGO et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
   ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Pursuant to Memorandum Opinion and Order entered this day, defendant City of Chicago's motion for a new trial is denied.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | |
|---|---|
| | No notices required, advised in open court. |
| | No notices required. |
| ✓ | Notices mailed by judge's staff. |
| ✓ | Notified counsel by telephone. |
| | Docketing to mail notices. |
| | Mail AO 450 form. |
| | Copy to judge/magistrate judge. |

number of notices

SEP 19 2003 date docketed

docketing deputy initials

courtroom deputy's initials: JS

Date/time received in central Clerk's Office

date mailed notice: 9-19-03

mailing deputy initials

Document Number: 311

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| GEORGE GARCIA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 01 C 8945 |
| | ) |
| CITY OF CHICAGO, OFFICER ZAMIR | ) SEP 1 9 2003 |
| OSHANA, JOSEPH FIVELSON, and | ) |
| SARGON HEWIYOU, | ) |
| | ) |
| Defendants. | ) |

MEMORANDUM OPINION AND ORDER REGARDING
DEFENDANT CITY OF CHICAGO'S MOTION FOR NEW TRIAL

On May 2, 2003, the jury returned a verdict in favor of plaintiff George Garcia ("Garcia") and against defendant City of Chicago ("City"), and awarded Garcia $1 million in compensatory damages.[1] In doing so, the jury found the elements of Garcia's Monell claim against the City to have been proven by a preponderance of the evidence, including the fact that on February 2, 2001, Garcia sustained injuries, which "were directly caused by defendant City of Chicago's custom and practice of not adequately investigating, disciplining, or prosecuting off-duty Chicago police officers who use excessive force against individuals" (Tr. 2192), when Garcia was attacked and beaten[2] by Chicago police officer defendant Zamir Oshana, who was off-duty at the time, and another assailant,

---

[1] That $1 million damage award has been remitted to $250,000, one-fourth of the jury's award, in a separate opinion issued today on the City's Request for Remittitur.

[2] The relevant details of the February 2, 2001 attack and Garcia's injuries are set out in this court's memorandum opinion issued today as to the City's Request for Remittitur. Among other injuries, Garcia's nose was broken and his eye orbital was fractured when he was knocked to the ground and kicked in the face, as well as in other parts of his body.

who Garcia did not know at the time, but who was later identified as Sargon Hewiyou. The jury, in answering a special interrogatory, additionally found that defendant police officer Zamir Oshana acted under color of state law during his February 2, 2001 attack on Garcia. (Dkt. No. 253).

On May 16, 2003, defendant City filed this Motion for New Trial under Fed.R.Civ.P. 59 (hereinafter cited as "City's Mo."). The City has segmented its arguments to support its motion into the following three categories of claimed error:

"A. The Court Improperly Excluded Evidence" (City's Mo. p. 2-7);

"B. The Court Committed Error by Permitting Plaintiff to Introduce Evidence Uncovered Through Untimely, Overbroad Discovery" (City's Mo. p. 7-8);

"C. The Court Committed Error by Refusing the City's Instructions and Special Interrogatories and By Giving Legally Improper Instructions" (City's Mo. p. 8-10).

For the following reasons, the City's Motion for New Trial is denied.

I. <u>Summary of the Key Facts Proven at Trial Regarding the City's Liability</u>

In January 2000, over a year before Garcia was beaten, Chicago Alderman William M. Beavers of the City's 7th Ward, in his capacity as Chairman of the Committee on Police and Fire of the Chicago City Council, notified all members of the Chicago City Council by means of an official resolution (hereinafter "Beavers Resolution") submitted to the City Council (Pl.'s City Council Ex. Nos. 1 and 3) that there existed, among other difficulties, in the Chicago Police Department ("CPD"):

> an environment where police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable even in instances of egregious misconduct. (Pl. City Council Ex. No. 1).

Although Alderman Beavers set a hearing with the City Council Committee on Police and Fire as to the Beavers Resolution for Thursday, January 20, 2000 (Pl.'s City Council Ex. No. 2), no evidence of any further action by that Committee or the City Council on the Beavers Resolution during the year 2000 or in the month of 2001 before Oshana and Hewiyou attacked Garcia, or at any other relevant time, was presented. The evidence did establish that defendant police officer Oshana believed, consistent with the findings in the Beavers Resolution, that neither he nor his co-assailant, Hewiyou, would be held accountable for the egregious misconduct of brutally attacking Garcia. Oshana told Hewiyou before the attack that the police would "cover up" the attack on Garcia. (Tr. 1033).

The "environment" described in the Beavers Resolution, which addressed both on-duty and off-duty police officers misconduct, was proven to be a widespread custom and practice within the CPD regarding off-duty police misconduct. Exhibits received in evidence called the complaint registration ("CR") files (Def.'s Exs. 1 through 72) documented citizens' complaints about and the CPD investigations into misconduct by off-duty police officers, for the period August 1, 1999 through June 2001. (Agreed Stipulation No. 2). The evidence established that during the relevant time, the pattern and practice within the CPD in handling allegations of off-duty police officer violence was defective and insufficient in the following ways: investigations were incomplete, inconsistent, delayed, and slanted in favor of the officers; investigative leads were not pursued; incidents were covered-up; evidence was destroyed; officers were not arrested; and private citizens were discouraged from filing complaints about police officer misconduct. (Tr. 445-500, 558-89, 1996-97; Def.'s Exs. 1-72). There was evidence that the CPD protocol was to treat police officers more favorably than other citizens when investigating and prosecuting police officers misconduct.

3

(Tr. 500-12, 558-89, 2002-03; Pl.'s Trial Ex. 21). Only one out of all accused officers in the CR files received in evidence as Defendant's Exhibits 1 through 72 was arrested (Tr. 506, 558-89), only two of the 71 files of off-duty use of force complaints were referred for possible prosecution (Agreed Stipulation No. 4) (Tr. 756), and there is no evidence of the City subjecting any accused off-duty officers to discipline. (Tr. 1993-94). At trial, certain citizens identified in the CR files who had been harmed by off-duty City police officers during the relevant period testified about their personal experiences and corroborated the custom and practice alleged by the plaintiff. (Tr. 644-670).

The evidence further established that Sergeant Fivelson, the CPD investigator assigned to the Garcia complaint, carried out his responsibilities to investigate in a far from vigorous manner. It was clear that Fivelson did only the minimum necessary to give the appearance of adequacy in his approach to the investigation. The evidence further established that if Garcia had not filed a lawsuit and had not been represented by counsel who pursued Garcia's case zealously, Fivelson would not have taken the steps he did take. Were it not for plaintiff's counsel's efforts, the truth about Oshana's and Hewiyou's attack on Garcia would not have been revealed, and Oshana's pre-attack assurance to Hewiyou that the police will cover-up the attack would have come true. The inadequacy of Fivelson's investigation, Fivelson's improper delay in providing to plaintiff's counsel the information Fivelson did uncover, and Fivelson's demeanor on the witness stand at the trial also corroborated plaintiff's counsel's position that the City had a custom and practice of not adequately investigating, disciplinary, or prosecuting misconduct by off-duty police officers.

Additionally, plaintiff's expert, Dennis Waller, testified that the totality of the problems evident in the CR files encouraged off-duty police officers to believe that they could use violence with impunity and that their misconduct would be covered up so they would suffer no penalties or

4

repercussions. (Tr. 588). Even the City's expert, Charles Gruber, testified that the totality of the CPD problems set forth in the Beavers Resolution, and in the other evidence Gruber reviewed, "might encourage someone in officer Oshana's shoes to . . . think he could get away with what he did to George Garcia." (Tr. 2011).

II. This Court's Evidentiary Rulings at Trial

This court, in making its evidentiary rulings at the trial, was mindful that during the pretrial phase of this case Magistrate Judge Denlow had determined that the appropriate time period for discovery on plaintiff's Monell claim against the City was January 1, 1999 through June 30, 2001 from which the City had to produce excessive force complaints in the 17th District. (Dkt. No. 47).[3] The City did not appeal that determination by Judge Denlow to this court or voice any disapproval of it. So, this court considered that established time-frame to be the relevant period about which the parties could offer evidence on the issue of the existence or non-existence of the custom and practice which plaintiff alleged caused his injuries on February 2, 2001. To have allowed the City to present evidence at the trial regarding events outside this relevant time period, about which no discovery had been allowed or provided to plaintiff, would have been unfair.

A. The Court's Rulings Excluding Certain Evidence

1. The Testimony of Current OPS Chief Administrator Lori Lightfoot

As an initial matter on this point, the court notes that the City's statement in footnote 18 on page 10 of its Reply that "Plaintiff never objected to Lightfoot" is not correct. Plaintiff's counsel

---

[3]The 72 files of CR complaints relating to incidents involving allegations that off-duty police officers used violence which were provided by the City during discovery covered an even shorter period, August 1, 1999 through June 30, 2001, (Agreed Stipulation No. 2), than Judge Denlow had ordered.

5

vigorously objected stating: "Your Honor, we believe that Chief Administrator [of the Chicago Police Department's Office of Professional Standards ("OPS")] Lightfoot should be barred from testifying." (Tr. 1569, line 19). Plaintiff's counsel then stated meritorious reasons supporting plaintiff's position. (Tr. 1569-70). This court, after the City's foundational proffer of Lightfoot's testimony (Tr. 1554-69) and after hearing arguments for both sides (Tr. 1569-73), granted plaintiff's request to bar Lightfoot's testimony as to any of OPS' practices before Lightfoot joined OPS on August 1, 2002. The basis of the court's ruling was essentially that Lightfoot did not have personal knowledge under Federal Rule of Evidence 602 of those previous OPS practices. (Tr. 1573). This court ruled that Lightfoot would be allowed to testify about relevant OPS practices which existed after she began her tenure with OPS on August 1, 2002. (Tr. 1573; 1846-1847). The City declined to call Lightfoot to testify before the jury at the trial for that purpose.

Neither of the two Seventh Circuit cases upon which the City relies for its position that this court was "wrong" in interpreting the "personal knowledge" requirement of Rule 602 and "chary" in its definition (City Reply, p. 10), Agfa-Gevaert, A.G. v. A.B. Dick Co., 879 F.2d 1518 (7th Cir. 1989) and United States v. Giovanetti, 919 F.2d 1223 (7th Cir. 1990), are on point. Three key facts distinguish those cases from the case at bar. In both Agfa and Giovanetti, the witnesses, whose testimonies were deemed admissible: (1) were part of the organization about which they were asked to testify at the time of the events in question; (2) received the information about which they were asked to testify in the regular course of the respective organization's operations from specifically identified sources and persons; and (3) were in the best position within the respective organization at the time of the events in question to personally know the organization's information about which they were asked to testify. Here, Lightfoot: (1) was not a part of OPS during the

6

relevant time; and (2) learned the information about which she was asked to testify not in the regular course of business, but long after this lawsuit had been filed and while she, Lightfoot, was trying to decide whether or not to accept her current OPS position. Lightfoot learned the information by reviewing unspecified documents which City personnel provided Lightfoot, as well as by talking to various people, some of whom were identified and some were not, and who may, or may not, have provided Lightfoot self-interested opinions on unspecified occasions. Additionally, as to distinguishing fact (3), Lightfoot was not the person in the best position to know the OPS customs and practices on February 2, 2001, the date plaintiff sustained injuries as a result of those practices. Indeed, the person who fulfilled these criteria was Callie Baird, Lightfoot's predecessor at OPS. (Tr. 1556-57). Yet, it was Lightfoot, not Callie Baird, that the City's counsel chose to name on their Final Pretrial Order list of potential witnesses (Dkt. No. 231, p. 17-21) and to call to the witness stand to present the City's position at the trial regarding OPS policies and practices on February 2, 2001. Trial witnesses are not the same as media spokespeople, to be called to the witness stand to present an institution's spin based upon the information supplied by unknown others, who are not subject to cross-examination. Lightfoot's testimony was not based on her personal knowledge as required by Federal Rule of Evidence 602 and therefore properly limited.

2. The City's Collective Bargaining Agreement

When Plaintiff's City Council Exhibits 1, 2, and 3 were offered in evidence by plaintiff, the only objection the City voiced was relevance (Tr. 1702-04), which the court overruled (Tr. 1705) because those exhibits clearly proved the City Council was apprised in January 2000, when the Beavers Resolution was presented to the City Council, that, among other things, there existed in the CPD:

7

an environment where police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable even in instances of egregious misconduct. (Pl.'s City Council Ex. No. 1).

The City neither introduced nor proffered any relevant evidence in response to Plaintiff's City Council Exhibit Nos. 1, 2, and 3. One of the City's trial counsel mentioned a collective bargaining agreement (Tr. 1705-06), but never presented any evidence to show what action, if any, the City Council took within the relevant time of January 1, 1999 through June 30, 2001 to address the problems set out in the Beavers Resolution other than that stated in Plaintiff's City Council Exhibits No. 1, 2, and 3. (Tr. 2016). Even the City's expert witness, Charles Gruber, agreed that the totality of the problems in the CPD he reviewed, including the Beavers Resolution (Pl.'s City Council Ex. No. 1), might encourage someone in Oshana's shoes to think he could get away with what he did to George Garcia. (Tr. 2011). Moreover, this court never excluded any relevant evidence which the City's attorneys actually proffered. (Tr. 1705-06). Any City collective bargaining agreement finalized after the incident or after June 2001 was not relevant to the issues on trial. The purported agreement, on which the City now states it wanted to offer evidence, was, according to the City's counsel, finalized in 2002 (Tr. 1623), but no copy of it was ever marked, identified, or actually offered in evidence. (Tr. 1624-26).

3. Evidence of Events Outside the Relevant Period

The City's third claim of error is that this court did not allow the City's witnesses to testify at trial about events outside the relevant time period of January 1, 1999 through June 30, 2001 on which the City had not provided pretrial discovery. As stated earlier, for this court to have ruled

8

otherwise would have been manifestly unfair and prejudicial because the City had not provided discovery to plaintiff's counsel regarding that evidence. (Tr. 1733-35).

4. Defendant's Exhibit 73

Defendant's Exhibit 73, the CR file of the Oshana/Garcia incident, was identified by the City in the Final Pretrial Order (Dkt. No. 231, p. 10) and some portions of it were objected to by plaintiff's counsel. Throughout the trial both the plaintiff's counsel and the City's counsel used certain specifically identified materials contained in Defendant's Exhibit 73 (Tr. 1105, 1112, 1125, 1137, 1191, 1237, 1256, 1258, 1267, 1418, 1442, 2030), and materials, other than those specifically identified and received in evidence (Tr. 1291, 1293, 1298, 1359, 1420, 1422), were objected to by plaintiff's counsel on hearsay grounds (Tr. 1237, 1267, 2043). At the conclusion of all the evidence, without laying an appropriate evidentiary foundation, the City offered the entire Defendant's Exhibit 73 into evidence. (Tr. 2042). Plaintiff's counsel objected again on hearsay grounds, and this court sustained the objection. (Tr. 2043). No proper foundation was laid to overcome plaintiff's hearsay objection to the various items in Defendant's Exhibit 73 that were not received in evidence. (Tr. 2070-71).

B. The Court's Ruling Allowing Plaintiff's Rule 45 Subpoena

Although the City in its motion does not mention the particular documents admitted in evidence as a result of plaintiff's Rule 45 subpoena for records of the Police and Fire Committee of the Chicago City Council (City's Mo. p. 7-8), the documents relating to the Beavers Resolution, Plaintiff's City Council Exhibits No. 1, 2, and 3, were among the records provided to plaintiff's counsel pursuant to that subpoena at the beginning of the trial. Those records, however, should have been, but were not, provided by the City to plaintiff's counsel during the discovery phase of this

9

litigation. Plaintiff's City Council Exhibits Nos. 1, 2, and 3 were responsive to Request No. 1 of Plaintiff's First Set of Requests for Production to Defendant City of Chicago which requested the City to provide to plaintiff's counsel:

> 1. All Documents which relate to, support and/or rebut any of the allegations or claims in plaintiff's complaint in this action. (Dkt. No. 199, Exhibit 0, p. 2).

Plaintiff's City Council Exhibit No. 1, the Beavers Resolution, was introduced in the City Council in January 2000, within the established relevant period of January 1999 through June 2001 and clearly supported plaintiff's Monell claim.[4] Additionally, the City's expert witness, Charles Gruber, had testified at his deposition before the trial that if there was additional information known to the City Council which had not been made known to him, his opinion could change. (Dkt. No. 240, p.2). Consequently, the information known to the City Council, such as that contained in the Beavers Resolution, was relevant to the issues on trial. Indeed, the Beavers Resolution, Plaintiff's City Council Exhibit No. 1, which discussed the City's handling of police misconduct by both on-duty and off-duty police officers did cause Gruber to change his opinion. Gruber testified that the totality of the CPD's problems, including those set forth in the Beavers Resolution, could cause someone in Oshana's shoes to think he could get away with what he did to George Garcia. (Tr. 2011). The Beavers Resolution was highly significant, "smoking gun" type of evidence which went a long way

---

[4]This was not the first time in this litigation that the City's counsel was shown to have violated discovery rules and procedures. The undisputed evidence established at trial that the City withheld other relevant documents during discovery even after a judicial order to produce them had been entered. (Agreed Stipulation No. 1). Additionally, the evidence established that the City's counsel authorized City personnel to sign and serve false sworn interrogatory answers in this case, (Pl.'s Ex. 4-A); (Tr. 1000-1006); (Pl.'s Ex. 6-A); (Tr. 1108-1123). City personnel, after speaking with the City's outside counsel, Darcy Proctor, (Tr. 1136) also provided false sworn answers to certain of Plaintiff's Second Set of Requests to Admit (Pl.'s Exs. 5-A and 5-B); (Tr. 1131-1141).

toward proving plaintiff's Monell claim. The City had not produced the Beavers Resolution during discovery. The trial subpoena served directly on the pertinent City Council Committee by plaintiff's counsel was an appropriate act to obtain that evidence which had not been previously produced. This court's ruling denying the City's Motion to Quash (Tr. 3) was appropriate as well.

C. The Court's Rulings on the Jury Instructions

In this section of the City's motion (City's Mo. p. 8-10), it initially attacks in general terms the court's jury instructions. The City's complaint is basically that this court's refusal to give the City's Proposed Jury Instructions 24, 30-34, and 37 was error. The court will discuss below each of these proposed jury instructions.

Contrary to the City's argument, City's Proposed Jury Instruction 24 was not refused, but was given verbatim (Tr. 2199, lines 11-15) and was included in the instructions contained in the special interrogatory on the color of law issue entitled "Question for the Jury." (Dkt. No. 253).

City's Proposed Jury Instructions 30 and 31 were refused because they were argumentative and improperly contained the phrase "caused by an official policy of the City of Chicago." This was a "custom and practice" case under City of Canton, Ohio v. Harris, 489 U.S. 378, 391 (1989) and City of St. Louis v. Praprotnik, 485 U.S. 112, 120 (1988). The jury was properly instructed as to the elements plaintiff Garcia had to prove (Tr. 2192-2193) and the proper definitions of the terms used therein. (Tr. 2193-2196); (Dkt. No. 254, p. 17-19). City's Proposed Jury Instructions 32 and 33 were refused because the legal concepts expressed therein were appropriately covered by the elements (Tr. 2192-2193) and the definitions instructions that this court gave. (Tr. 2193-96); (Dkt. No. 254, p. 17-19). The City's Proposed Jury Instruction 34, the definition of "deliberately indifferent," was covered appropriately in the court's instructions (Tr. 2194-95); (Dkt. No. 254, p.

11

18) under Board of County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 407-08, 411-12 (1997). The City's Proposed Jury Instruction 37, the definition of "caused," was appropriately covered also in the instructions the court gave (Tr. 2195-96); (Dkt. No. 254, p. 19-20) under City of Canton, 489 U.S. at 391. The City's proposed special interrogatories were both confusing and unnecessary. The case that went to the jury involved only one count, not multiple counts with various legal theories for the jury to sort out. See Matter of CLDC Mgmt. Corp., 72 F.3d 1347, 1353-54 (7th Cir. 1996).

The City's proposed limiting instruction, which was requested after the plaintiff had rested his case-in-chief, sought to exclude from the jury's consideration evidence that had been admitted during the plaintiff's case-in-chief without any limitation, and without any request for a limitation, under Federal Rule of Evidence 105. That proposed limiting instruction was not appropriate for three reasons. First, much of the evidence it sought to exclude had been presented to the jury by stipulation as undisputed, as well as without limitation as to a particular issue. Second, the evidence which the City's proposed limiting instruction sought to have excluded from the jury's consideration was not adequately identified in the City's proposed limiting instruction to inform the jury properly what evidence it should and should not consider in arriving at its verdict. Third, the evidence mentioned, but not properly identified in the City's proposed limiting instruction, was relevant to the issues which were still before the jury, such as the credibility of CPD personnel Fivelson and Oshana, as well as other issues, such as the scope of the defined widespread custom and practice of covering up off-duty police misconduct by not adequately investigating, disciplining, or prosecuting off-duty Chicago police officers. Accordingly, this court did not commit error in refusing the City's proposed jury instructions.

## CONCLUSION

There is no factual or legal basis to overturn the jury's finding that the City is liable to the plaintiff George Garcia in this case. For the reasons stated above, the City's Motion for New Trial is denied.

ENTER:

*James F. Holderman*
JAMES F. HOLDERMAN
United States District Judge

DATE: September 19, 2003