*Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James F. Holderman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8945 | **DATE** | September 19, 2003 |
| **CASE TITLE** | GARCIA vs. CITY OF CHICAGO et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Pursuant to Memorandum Opinion and Order entered this day, defendant City of Chicago's request for a remittitur is granted. Status hearing is set for October 9, 2003 at 9:00 am. Defendant Oshana is ordered to appear on October 9, 2003 at 9:00 am. Defendant City of Chicago is ordered to advise defendant Oshana of this order forthwith. Defendant Oshana is advised that failure to appear on October 9, 2003 at 9:00 am. may result in entry of default judgment.

(11) ☐ [For further detail see order (on reverse side of/attached to) the original minute order.]

| | No notices required, advised in open court. | | number of notices | Document Number |
|---|---|---|---|---|
| | No notices required. | | | |
| X | Notices mailed by judge's staff. | | 9-19-03 date docketed | |
| W | Notified counsel by telephone. | | | 317 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | U.S. DISTRICT COURT CLERK | | |
| | Copy to judge/magistrate judge. | 03 SEP 19 PM 3:55 | 9-19-03 date mailed notice | |
| JS | courtroom deputy's initials | Date/time received in central Clerk's Office | mailing deputy initials | |

DOCKETED
SEP 19 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

GEORGE GARCIA, )
)
Plaintiff, )
)
v. ) No. 01 C 8945
)
CITY OF CHICAGO, OFFICER ZAMIR )
OSHANA, JOSEPH FIVELSON, and )
SARGON HEWIYOU, )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT CITY OF CHICAGO'S REQUEST FOR REMITTITUR

On May 2, 2003, the jury returned a verdict in favor of plaintiff George Garcia ("Garcia") and against defendant City of Chicago ("City"), and awarded Garcia $1 million in compensatory damages. On May 16, 2003, the City filed a Fed.R.Civ.P. 50(b) renewed motion for judgment as a matter of law and a Fed.R.Civ.P. 59 motion for a new trial or in the alternative, a new trial on damages or a remittitur. The City's Rule 50(b) renewed motion for judgment as a matter of law and Rule 59 motion for new trial are each denied for reasons set forth in separate orders entered today. However, for the following reasons, this court grants the City's alternative request for a remittitur of the compensatory damages award and remits the jury's verdict to $250,000.

## SUMMARY OF KEY FACTS PROVEN AT TRIAL REGARDING GARCIA'S DAMAGES

On February 2, 2001, Garcia was at his uncle's restaurant on the north side of Chicago to pick up his younger brother and his cousin. While waiting for them to arrive, Garcia saw a black truck on Foster Avenue slowing down and somebody glancing out of the window. He soon recognized

1

317

the truck to be that of defendant Chicago police officer Zamir Oshana ("Oshana"). Oshana was off-duty at the time. Garcia became really nervous because Oshana had previously been threatening to beat up Garcia over a picture Garcia had of Oshana flashing a gang sign, something Oshana did not want the Chicago Police Department ("CPD") to know about because of CPD's prohibition against Chicago police officers having gang affiliations. Garcia, because of his fear of Oshana, immediately went to a Chicago police station half a block away from his uncle's restaurant and explained the situation to a police officer. While talking to the police officer, Garcia observed Oshana's truck passing by on Foster Avenue again, and showed this to the officer, who directed Garcia to contact the "OPS," the Chicago Police Department Office of Professional Standards.

After leaving the police station, Garcia ran back to his uncle's restaurant and saw his brother and cousin sitting in the restaurant. Later, when Garcia, his brother, and his cousin left the restaurant, Oshana's truck drove up quickly in front of Garcia and stopped. Garcia felt very scared. A big individual, later identified as Sargon Hewiyou ("Hewiyou"), came out of the passenger door yelling, "Come here. Let me talk to you. Come here, come here." (Tr. 76-77.) Hewiyou is a large individual, approximately six feet tall and weighing about 240-250 pounds. Hewiyou was dressed in all black, wearing a black bomber jacket, with a type of microphone on his shoulder with a wire going towards his jacket. Garcia testified that he did not run because he thought Hewiyou was a Chicago police officer. Garcia knew Oshana, who was with Hewiyou, was a Chicago police officer. Hewiyou and Oshana continued to yell at Garcia and told Garcia to give them the picture of Oshana flashing gang signs that Garcia had. Hewiyou pushed Garcia against the restaurant front window and demanded the picture, which Garcia denied having with him. Oshana and Hewiyou then attempted to grab Garcia and take him to Oshana's truck. Garcia tried to run back to the restaurant but Hewiyou and Oshana stopped him. In an attempt to escape, Garcia told them he was going to

2

"tell the cops" and warned, "Oh, look, there they go right there." (Tr. 80.) Hewiyou and Oshana responded, "[w]e are the police. We are the cops." (Tr. 80.) Hewiyou unzipped his jacket and pulled out a chain with a star on it and told Garcia: "I am a cop. I am a cop, Bitch." (Tr. 80.) Oshana also told Garcia that he was the police, and unzipped his jacked and showed Garcia a gun.

Hewiyou then slapped and head-butted Garcia, and called him a "sissy." When Garcia tried to run again, Hewiyou pushed and punched Garcia. Oshana also punched Garcia around his eye area, causing Garcia to fall to the ground. While Garcia was on the ground, Oshana kicked Garcia in the face between his nose and eyes, and then on his hip and on his legs. When Oshana kicked Garcia's hip, Garcia testified that he experienced "one of the worst pains [he] had ever felt." (Tr. 119.) Garcia later learned that a tumor was growing in the spot where he was kicked by Oshana. After Oshana kicked Garcia in the hip, Garcia saw Oshana go pick up a garbage can and head toward him, so Garcia began to run away. Hewiyou and Oshana told Garcia to stop. Hewiyou and Oshana made gestures like they were reaching for their guns. Garcia was afraid they would start shooting at him so he kept running.

Garcia ran to the police station and explained to the officers at the counter that he had just been beaten up by police officers. Garcia stayed at the station for approximately one hour, during which time he was feeling a lot of physical pain and was exhausted and nervous. (Tr. 115.) Garcia declined the police officers' offer to take him to the hospital because he was fearful that Hewiyou and Oshana would learn from their fellow police officers which hospital Garcia had been taken to and would find him there. Upon leaving the police station, police officers escorted Garcia home. Garcia, fearing for his safety, locked all the doors in his house, made sure all the windows were closed and shades were down, and then went to the basement, locked the door, and waited until his parents returned home.

3

The next day, the pain in Garcia's hip and head was severe and he was still scared. (Tr.118.) Garcia also stated that his vision took a while to focus correctly. (Tr. 118.) Garcia went to Swedish Covenant Hospital for emergency outpatient care, where the doctor told Garcia he had a broken nose and a fractured eye orbital. (Defendant's Exhibit 73.) During the first week or two after the attack by Oshana and Hewiyou, Garcia experienced a lot of pain. In the days and weeks after the incident, cold air would cause tearing in Garcia's eye and give him migraines. Even after the swelling on his nose went down, Garcia still had problems breathing and his nose would bleed. Garcia's nose was basically disfigured. (Tr. 121.) That disfigurement remains today. The potential cost of any future medical procedure to correct the disfigurement to Garcia's nose was not presented in the evidence.

In the weeks after the incident, Garcia went to see a chiropractor, Dr. Sistino, at Lakeview Clinic regarding his leg and hip pain about three or four times and then stopped. (Tr. 120-121). In June 2001, Garcia discovered he had a tumor growing on his leg bone (Tr. 119-120) which he does not attribute to, but was aggravated by, (Tr. 119) Oshana and Hewiyou's February 2, 2001 attack on him.

## ANALYSIS

Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424, 432, 123 S.Ct. 1513 (2003). The Seventh Circuit uses three criteria to review a compensatory damages award: (1) whether the award is monstrously excessive; (2) whether there is no rational connection between the award and the evidence; and (3) whether the award is roughly comparable to awards made in similar cases. See Tullis v. Townley Eng'g & Mfg. Co., Inc., 243 F.3d 1058, 1066 (7th Cir. 2001). Because the Seventh Circuit views the "monstrously excessive" standard as "rather vague," it has suggested that it be merged with the rationality inquiry.

EEOC v. AIC Sec. Investigations, Ltd., 55 F.3d 1276, 1285 n.13 (7th Cir. 1995). Based upon a review of the evidence, this court finds that the jury's $1,000,000 compensatory damage award is monstrous, bears no rational connection to the evidence as to Garcia's damages presented at trial, and is considerably out of line with comparable cases in this circuit and in other circuits. First, Garcia's testimony, though demonstrating that Garcia was seriously injured by a brutal attack, does not support a $1,000,000 compensatory damages award based upon the concrete injuries he suffered as a result of Oshana and Hewiyou's actions. Garcia did not offer any evidence of medical bills, lost wages, or other monetary injury he suffered as a result of the City's wrongful conduct. Therefore Garcia's injuries are compensable only in terms of his "pain and suffering." See Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 305-07, 106 S.Ct. 2537 (1986) (stating that damages may include such injuries as impairment to reputation, personal humiliation, and mental anguish and suffering).

As presented through his testimony at trial, Garcia was punched two or three times; kicked three times; head-butted and slapped once; and bumped, pushed, and grabbed several times. Garcia suffered a broken nose and a fractured eye orbital, both of which healed on their own and did not cause any permanent disability. Although Garcia testified that the pain in his hip when it was kicked was the worst he had ever felt, Garcia also testified that he was able to run to the police station after the incident. When asked how the pain in his hip affected him in the days, weeks, and months after the incident, Garcia testified, without much elaboration, that it "hurt a lot," that it affected his ability to play basketball, and that sometimes it would "get loose." (Tr. 120).

With respect to his eye injury, Garcia testified that in the days and weeks after the injury, cold air would make him teary-eyed and give him migraine headaches, but that the injury eventually healed. Garcia testified that his broken nose was swollen and once the swelling went down, he had

5

"problems breathing" and that his nose would bleed, but it is unclear from Garcia's testimony how often he suffered these symptoms or how long they lasted. (Tr. 121.) Garcia still has a slightly crooked nose, but there was no evidence presented that the crooked nose caused or continues to cause Garcia any physical or emotional problems. Garcia visited the emergency room for outpatient care the day after the incident and was x-rayed, but it is unclear what, if any, additional treatment he was provided for his injuries. Garcia also stated that he visited a chiropractor three or four times in the weeks after the incident but did not elaborate at trial on this treatment. In sum, Garcia's testimony about his pain and suffering from his physical injuries was without elaboration or detail.

As to Garcia's emotional injuries, although an award for non-pecuniary loss can be supported solely by a plaintiff's testimony about his emotional distress, see Tullis, 243 F.3d at 1068, it is relevant to this court's inquiry that Garcia presented no medical expert evidence of his emotional or psychological injuries. Garcia's own supporting testimony on this matter is scant. Garcia testified that he was very scared and nervous before, during, and after the beating. After returning home on the evening of the beating, he locked himself in the basement waiting for his parents to return home. Aside from this brief testimony, however, Garcia did not testify to any further emotional damages stemming from the beating. Additionally, there was no testimony from any friends or family regarding the effect the beating had on Garcia, or that any psychological treatment was, or would ever be, necessary as a result of the beating.

This court recognizes the difficulty in determining a precise dollar amount for the intangible damages Garcia incurred from the beating. However, based on the nature of the incident and Garcia's injuries and the evidence presented at trial to support Garcia's emotional injuries stemming from the attack, this court concludes that the jury's $1,000,000 verdict is exaggerated and bears no rational relationship to the evidence of Garcia's compensatory damages presented at the trial. The

purpose of compensatory damages is to "indemnify the injured person *for the loss suffered,*" and nothing more. BLACK'S LAW DICTIONARY 394 (7th ed. 1999) (emphasis added). While the attack Garcia suffered on February 2, 2001 was brutal, the evidence established that the encounter lasted only a few minutes, and that Garcia suffered only non-permanent physical injuries and pain and suffering which was neither long-lasting nor required treatment. Consequently, this court believes the jury verdict as to Garcia's damages in this case to be "born of passion and prejudice," American Nat'l Bank & Trust Co. of Chicago v. Regional Transp. Auth., 125 F.3d 420, 437 (7th Cir. 1997), especially in light of the convincing evidence presented of the City's constitutional violation of not just Garcia's rights, but of the rights of the other citizens victimized by the misconduct of off-duty Chicago police officers. Compelling evidence presented at the trial established that the CPD's widespread practice during the relevant time period of January 1999 through June 2001 of not adequately investigating, disciplining, or prosecuting off-duty City police officers who use excessive force against individuals, and the City Council's deliberate indifference to it, directly caused Garcia's injuries. See Cooper, 532 U.S. at 432, 123 S.Ct. 1513 (explaining that punitive damages are aimed at deterrence and retribution while compensatory damages are intended only to redress the concrete loss suffered by reason of the wrongful conduct).

Additionally, the difference in the trial skills displayed by Garcia's primary trial counsel, Jon Loevy, and the City's primary trial counsel was stunning. In contrast to the City's counsel's presentations, Jon Loevy's examinations of witnesses and arguments to the jury were clear, engaging, and highly persuasive. The City's counsel had a style and took a strategic approach to the case which did not particularly endear the City's counsel to the jury. This tactic was especially evident in the manner the City's counsel handled the cross-examination of Garcia,[1] and the other

---

[1] For example, the City's counsel, Darcy Proctor, repeatedly enunciated a victorious "Okay" after many of Garcia's answers, as if to underscore the point she was attempting to make

7

victim witnesses who were presented as part of the plaintiff's evidence on the City's widespread practice.[2] The City's strategy of defending the case in the manner the City's counsel did was poorly conceived. Additionally, the City's counsel's courtroom style in front of the jury further fortified the plaintiff's theory of the City's calloused attitude toward the off-duty police misconduct proven by the evidence in the case. Coupling the compelling evidence which established the plaintiff's case with the highly effective presentation by Jon Loevy, and comparing that to the defense evidence and the City's counsel's style, the court believes the jury felt moved to send a message to the City that the deliberate indifference shown at the trial by the evidence during the relevant period should not have been tolerated. Although the City chose the counsel it sent to the courtroom for the trial, the City should not be forced to pay a monstrous verdict simply because that verdict was produced, in part, by the City's lawyers' less than stellar courtroom strategy and performance.

A review of other awards in this circuit and other circuits reveals that damages awards for excessive force and assault and battery claims with greater violence and that caused much greater injury than those Garcia sustained are rarely as large as the jury award of $1,000,000 for Garcia; by contrast, while perfectly analogous cases are difficult to locate, awards for batteries resulting in similar non-permanent injuries tend to lead to substantially lower awards. See e.g., Niehus v. Liberio, 973 F.2d 526 (7th Cir. 1992) ($336,000 compensatory award for excessive force resulting in a fractured cheekbone, brain injury, significant and permanent mental, psychological, and emotional impairments); Blisset v. Coughlin, 66 F.3d 531 (2d Cir. 1995) ($74,000 award in damages for excessive force where plaintiff was struck repeatedly by guards with their hands and batons,

---

with her prior question. Such a tactic with a witness who the City did not dispute had been brutally attacked was counterproductive. (Tr. 127-141; 143-150; 200-204; 207-209).

[2]Proctor used the same cross-examination tactic of announcing "Okay" to underscore her point after each of numerous answers by these other victim witnesses as well. (Tr. 648-650; 659-664).

8

handcuffed so tightly as to cut off circulation to his hands, lost consciousness, had recurring problems with his right knee and suffered considerable emotional distress); Hygh v. Jacobs, 961 F.2d 359 (2d Cir. 1992) ($216,000 compensatory damages award for use of excessive force by a police officer where plaintiff suffered a blow to his face, likely with a flashlight or other blunt object, that fractured his cheekbones, required surgery under general anesthesia, and left the left side of his face permanently numb); Ruiz v. Gonzalez Caraballo, 929 F.2d 31 (1st Cir. 1991) ($150,000 in compensatory damages for "brutal" beating of woman in her thirty-seventh week of pregnancy which resulted in post-traumatic stress disorder); Sanders v. City of Indianapolis, 837 F.Supp. 959 (S.D. Ind. 1992) (granting remittitur of $1,500,000 verdict to $78,000 for humiliation, trauma, and post traumatic stress disorder arising from excessive force which caused two scalp wounds, a somewhat serious but non-blinding eye wound, some soft tissue injuries, a broken leg, a broken knuckle); Moreno v. Kelley, 00 C 0010, 2002 WL 58587 (N.D. Ill. Jan. 15, 2002) ($100,000 compensatory damage award for excessive force claim where two officers beat plaintiff with nightsticks which resulted in, *inter alia*, a fractured nose, a five-day hospital stay, and permanent scarring); King v. City of New York, 92 C 7738, 1996 WL 737195 (S.D.N.Y. Dec. 24, 1996) (court reduced $300,000 compensatory award to $200,000, where plaintiff was beaten, kicked and hit with a walkie-talkie by a police officer, had his head forced back with nightstick, received bruises, black eyes, abrasions, a gash in the head, and other multiple blunt trauma but suffered no permanent physical injuries, and was also subject to 30 minutes wrongful confinement and two months malicious prosecution).

In addition, the Jury Verdict Reports submitted by defendant City reveal several cases involving injuries similar to those sustained by Garcia which resulted in jury verdicts significantly lower than the $1,000,000 dollar jury verdict awarded in this case. See generally, Letter from

Allen Duarte Dated May 29, 2003 With Attachments (Docket Entry No. 285) (compensatory damage awards in Illinois cases with similar facts ranging from $30,000 to $250,000).

In his response to the City's request for remittitur, plaintiff Garcia cites to several different cases where damage awards ranged from $750,000 to over $4,000,000. (See Pl.'s Combined Resp. to Def.'s Post-Trial Mots. at 38-43.) However, this court finds the factual circumstances and injuries sustained in almost all of those cases distinguishable from those in this case. For example, Garcia cites to cases involving, *inter alia*, employment retaliation, the loss of mobility, the loss of an eye, multiple surgeries, attempted rape, and an arm amputation; these cases are inapposite to this court's consideration of Garcia's compensatory damages in this case.

The primary case Garcia relies upon in support of his position is Ibanez v. Velasco, 96 C 5990, 2002 WL 731778 (N.D. Ill. Apr. 25, 2002), in which Judge Grady upheld a $2,500,000 compensatory damage verdict in favor of plaintiff. In Ibanez, the jury heard testimony from the plaintiff, Michelle Ibanez, and four bystander witnesses, which the Ibanez court noted were the most credible witnesses the court had ever seen in all its years on the bench, that at least four police officers engaged in a vicious unprovoked beating of Ibanez. See id. at *8-9. During the beating, one officer began saying profanities to Ibanez, and then began beating her, pulling her hair, scratching, punching, and kicking her. See id. Another officer choked Ibanez and told her to shut up, while others held Ibanez by her ankles and dragged her outside. See id. A number of other police officers then rushed to assist and they took turns hitting and kicking Ibanez. See id. The officers surrounded Ibanez to block witnesses' views of the incident, and then repeatedly kicked and punched her in the head with closed fists, and stomped on her head. See id. While plaintiff's physical injuries were not severe and consisted of bruising, scratches, neck pain, pain in her right arm and right side, and difficulty swallowing, there was substantial evidence presented, including from

several medical professionals, that the plaintiff also suffered from gynecological problems, post-traumatic stress disorder, recurrent major depression, amenorrhea, suicidal thoughts, anxiety, panic, fatigue, overeating, and recurrent bulimic behavior. See id. at *6, 10. The plaintiff testified that she continued to have periods of depression, spontaneous crying episodes, and felt "emotionally handicapped." Id. The factual situation and the evidence provided by the plaintiff in Ibanez is dramatically more egregious than the evidence presented in this case by Garcia in support of his compensatory damage award. In fact, the beating and resulting injuries in Ibanez can reasonably be said to be ten times more offensive and injurious than those in the incident at issue here. This court, therefore, does not find the award upheld in Ibanez, which was not appealed, to be particularly persuasive in crafting an appropriate remittitur in this case.

For all the reasons stated above, this court finds that the jury's $1,000,000 compensatory damages award in favor of Garcia to be monstrously excessive, not rationally connected to the evidence presented, and finally, not roughly comparable to awards made in similar cases. See Tullis, 243 F.3d at 1066. The $1,000,000 verdict is far beyond a reasonable amount of compensation for the injuries Garcia proved he sustained on his excessive force claim. Compensatory damages "must be proportioned to injury . . . [j]udges and juries must not be casual with other people's money." Avitia v. Metropolitan Club of Chicago, Inc., 49 F.3d 1219, 1229 (7th Cir. 1995). Consequently, based on the examples of compensatory damage verdicts presented post-trial by counsel, the court finds that a reasonable award in this case would be $250,000, which is at the high end of the City's proffered examples.

## CONCLUSION

Defendant City of Chicago's alternative request for a remittitur of the jury's $1,000,000 compensatory damages verdict in favor of plaintiff George Garcia on his excessive force claim against the City is granted. This court orders Garcia to consent to a $750,000 remittitur of the $1,000,000 jury verdict, resulting in an award of $250,000 in compensatory damages for plaintiff George Garcia on his excessive force claim against the City, or to consent to a new trial on the issue of compensatory damages against the City on this claim. Garcia may file with the Clerk of Court an acceptance of the remittitur to $250,000 with respect to his excessive force claim on or before October 7, 2003. In the event that Garcia does not file an acceptance of the remittitur on or before October 7, 2003, a new trial on Garcia's compensatory damages, the City's liability having been established on Garcia's excessive force claim will commence on a date to be set by the next status report and will proceed in conjunction with the trial of defendant officer Zamir Oshana.

Regardless of whether Garcia accepts the remittitur, the case is set for report on status at 9:00 a.m. on October 9, 2003. Plaintiff's counsel, the City's counsel, and defendant police officer Zamir Oshana are ordered to be present. The City's counsel are ordered to notify CPD officer Oshana to be present. The failure of Oshana to be present at the 9:00 a.m., October 9, 2003 status report may result in default judgment being entered against him.

ENTER:

*James F. Holderman*
JAMES F. HOLDERMAN
United States District Judge

DATE: September 19, 2003

12